WHEATON (WASHINGTON v.). See Case No. 17,239.

## Case No. 17,488.

### In re WHEELER.

### Ex parte CARTER et al.

[2 Lowell, 252.] [1]

District Court, D. Massachusetts. May, 1873.

CONTRACT MADE BY AGENT—PROOF OF RATIFICATION—BANKRUPTCY OF PURCHASER—SET-OFF.

1. A., doing business in Worcester, Mass., made a contract with B.'s agent in New York (B. living in Philadelphia) to buy a large quantity of iron, deliverable in monthly instalments, on credit. The contract was subject to B.'s ratification. A day or two afterwards A. called on B., who told him he had received the order and entered it on his books. The parties afterwards corresponded about the contract, as subsisting. Held, there was sufficient evidence of ratification.

2. Before the time came for delivering the first lot of iron under this contract, A. failed, and notified his creditors that he could only pay twenty-five per cent of the amount of his debts. At the meeting of creditors at which this offer was made, C. told B.'s agent that he would take the iron on A.'s behalf; but he did not offer to pay cash for it. Held, B. was not bound to accept this offer.

3. Afterwards B.'s agent, with authority, wrote A. that B. would not deliver the iron unless his old debt were paid. A. took no notice of this letter, and afterwards went into bankruptcy. Neither A. nor his assignees in bankruptcy ever offered to pay cash for the iron, or demanded its delivery; and there was no evidence that they were ever able or prepared to pay for it. Held, the letter of B.'s agent was not, under these circumstances, such a repudiation of the contract as would authorize A.'s assignees to set off the value of the contract against B.'s debt provable in bankruptcy.

[Cited in Ex parte Pollard, Case No. 11,252.]

The bankrupt was a manufacturer of iron at Worcester, Mass., and bought large quantities of pig-iron of the firm of W. T. Carter & Co., of Philadelphia. At the time of his failure he owed them a balance, represented by notes and accounts, amounting to about $13,000, which they offered for proof against the estate. The assignees claimed a set-off for damages, arising out of the alleged breach of a contract by these creditors to sell the bankrupt five hundred tons of iron. The evidence was, that, on the 25th January, 1872, John H. Thompson, of New York, an iron broker, agreed, on the part of Carter & Co., to sell to Wheeler five hundred tons of Coleraine pig-iron, deliverable in lots of one hundred tons at Hoboken, in New Jersey, to be shipped thence to Worcester, by way of Norwich, on the twenty-fifth days of February and March, the twentieth days of April and May, and the fifteenth day of June, respectively, on credit. Thompson made a memorandum of the sale, which was agreed to be sufficient to comply with the statute of frauds, if he was authorized to make it. The terms of his agency were, that he should sell iron for the plaintiffs, subject to their approval. He at once sent them notice of the sale; he testified that he did not think he had ever received any notice of its acceptance. One of the plaintiffs testified that it had never been formally accepted. Wheeler deposed that he saw Mr. Carter a day or two after the sale, and Carter said it had been received and entered on their books. Towards the middle of February, and before the thirteenth, Wheeler failed, and called a meeting of his creditors, which was held at Worcester on the fifteenth, when he made an offer of twenty-five cents on the dollar in settlement of his debts. Thompson attended this meeting on behalf of the plaintiffs, and refused this offer. While there, another creditor, friendly to Wheeler, offered to take, on Wheeler's account, the iron which was to be delivered under the contract, and to be personally responsible for the price. Thompson refused to send it to him unless he would become answerable for the old debt; and at the same interview he told Wheeler that he must pay cash if he took the five hundred tons. Letters passed between the parties which show that the plaintiffs were very much dissatisfied with the statement of Wheeler's affairs. On the 19th of February, Thompson wrote Carter & Co., among other things: "Mr. Wheeler says he will be able to take the five hundred tons of iron at the periods

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

agreed upon, and I have told him if he does so he will have to pay cash for it, as the iron is delivered at Hoboken." On the 23d of February, Thompson wrote to Wheeler, among other things, that Carter & Co. positively refused to let him have any part of the five hundred tons, unless the iron already had by him should be paid for in full. Afterwards, in March or April, Wheeler saw Carter & Co. in Philadelphia, and they offered, as he testified, to make a considerable allowance for this contract, as part of an arrangement for settling the old debt. But the negotiation failed. Wheeler petitioned for adjudication of bankruptcy April 12, 1872. There was no evidence, excepting as above given, that either he or his assignees had offered to take or pay for the iron, or that any thing further had been said or done about it. Iron rose largely in price after January 25; and it was agreed that, if the plaintiffs were liable in set-off or mutual credit, the amount of damages was $5,500.

T. L. Nelson, for assignees.

There is sufficient evidence that the contract was ratified by Carter & Co., and this is equivalent to previous authority. Browne, St. Frauds (2d Ed.) 370. The letters prove this. Id. §§ 346, 347, 357, 359; Coddington v. Goddard, 16 Gray, 436; Blackb. Sales, 115. We admit that, upon Wheeler's insolvency, the sellers might withhold the goods until they received the price. But as they declared beforehand that they would not deliver, it was not necessary for Wheeler or his assignees to tender the price. A tender need not be made, if it would be fruitless. Chit. Cont. (7th Am. Ed.) 443; Cook v. Doggett, 2 Allen, 439.

P. Emory Aldrich, for creditors.

We deny that any contract was made. But, if made, Carter & Co. could retain the iron until paid for, after the failure of Wheeler had annulled the agreement for a credit. Arnold v. Delano, 4 Cush. 33; Bloxam v. Sanders, 4 Barn. & C. 941; Bloxam v. Morley. Id. 951. In Bloxam v. Sanders, Bayley, J., says that the seller's right is something more than a lien, and that payment or tender of the price is a condition precedent to the buyer's right of possession. See Tooke v. Hollingworth, 5 Term R. 215. Carter & Co. never repudiated the contract. They were never called on to fulfil it. There is no sufficient evidence that either Wheeler or his assignees were ever in a position to fulfil their part, or ever intended or offered to do so; and it is impossible to say that Carter & Co. would not have performed their part if duly requested.

LOWELL, District Judge. It is admitted that a contract was entered into between Wheeler and Thompson, and a sufficient memorandum made of it, if the bargain was ever ratified by Thompson's principals. It appears that Thompson wrote them that Wheeler would call on them in Philadelphia; and that he did call, and they told him the order was received, and entered on their books. This is a ratification; because they would have no occasion to enter on their books a rejected offer. But, besides this, there is ample evidence that both parties considered it a binding and existing contract in February.

The real question in the case is, whether there has been a breach on the part of Carter & Co. It is agreed that, upon the failure of the buyer, they had the right to withhold the goods until the price should be paid or offered; and that if cash were offered or tendered, or if the want of tender was excused or dispensed with, and the cash was ready for them, they must go on and deliver the iron. The point of controversy is, whether an offer was made, or if not, whether it was waived. The assignees contend that, before the time for the first delivery came, the sellers rescinded the contract, and so left nothing for the buyer to do but to recover his damages. It was decided in the queen's bench in England, in 1853, that if one party to an executory contract repudiates it before the time of performance arrives, the other party may have his action immediately: Hochster v. De La Tour, 2 El. & Bl. 678. This was thought, at the time, to be a novel doctrine; but it has been followed by the other courts: Danube, etc., Co. v. Xenos, 13 C. B. (N. S.) 825; Frost v. Knight, L. R. 5 Exch. 322: s. c., in error, L. R. 7 Exch. 111. The leading case certainly commends itself to the judgment. A courier was engaged in April to serve for three months from the first of June; and in May the employer wrote him that he should not make the journey, nor need his services. The courier thereupon engaged with another traveller; but the new service was to begin at a later day than the first of June, and he sued the former employer in May for the value of the time thus lost, and it was held he might recover his damages. The case was classed with those in which the promisor has incapacitated himself from keeping his engagement; as if, having promised to marry A., he marries B. before the time has come for fulfilling his engagement with A., an action lies at once by the latter.

But it was found that these executory breaches, so to say, could not, in fairness, be made to apply in all cases. In Avery v. Bowden and Reid v. Hoskins, which were so much alike that they were argued and decided together in the court of error, the facts were, that a charterer was bound to furnish a cargo of grain at Odessa, to be shipped to England, at a time when war between Russia and Great Britain was imminent. The charterer's agent at Odessa notified the master of the vessel, immediately on his arrival at the port, and before he was bound to furnish a cargo, that he should not furnish it;

but the master insisted that he would wait during the time allowed by the contract; and, before that time had expired, war was declared, and performance of the contract became illegal. It was held that no action could be maintained by the ship-owner. 5 El. & Bl. 714, 729; 6 El. & Bl. 953. Upon a review of the decisions above referred to by Cockburn, C. J., in a recent case, he finds the law of England to be, that, when the promisor has announced his intention not to perform the contract, the promisee may treat the notice as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible; and in this case he keeps the contract alive for the benefit of both parties, and remains liable to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, but also to take advantage of any supervening circumstances which may justify him in declining to complete it; or he may treat the notice as a breach, and have his action at once. Frost v. Knight, L. R. 7 Exch. 112, 113. In Benj. Sales, p. 424, the English rule is stated thus: "A mere assertion that the party will be unable, or will refuse, to perform his contract, is not sufficient: it must be a distinct and unequivocal, absolute refusal to keep the promise, and must be treated and acted on as such by the party to whom the promise was made."

I have given the result of these cases, because they go farther than any that I have seen in this country to support the contention of the assignees; and I recognize a certain equity in their claim, which I should be not unwilling to make available, if the law would permit it. But it seems impossible to bring it under even the most advanced of the decisions.

Wheeler had broken his implied obligation to keep his credit good, and was notoriously and deeply insolvent, when the letter of the 23d of February, which is said to be, or to announce, the breach of contract by Carter & Co., was written. There is no satisfactory evidence that he or his assignees have since, at any time, been able or willing to carry out the contract which the law substituted for the original contract, that is, to pay cash on delivery, or that they ever told Carter they were ready. There was some talk about it at the meeting of the creditors at Worcester in February; but no offer was made which Carter & Co. were bound to accept, because the offer was not to pay cash. Judging from the evidence, the letter of Thompson to his principals, in which he writes that Mr. Wheeler says he shall be able to take the iron, refers to this conversation; for there does not appear to have been any other, nor any letters from Wheeler. I consider that the whole meaning of that letter, with the other evidence, is this: that Wheeler hoped to settle with his creditors, and go on in his business, and take the benefit of this valuable

contract. But he never was in a position to do so. I agree that, in the letter of 23d February, Thompson, acting for the plaintiffs, and by their authority, undertook to annex a condition to the delivery of the iron, which the law did not impose nor permit; but I regard this as an offer, which, under the circumstances, Wheeler should have taken some notice of, if he intended to insist on the renewal of the contract, or to hold it to be definitely renounced by Carter. This letter could not have reached him at Worcester until the day before the first lot of iron should have been paid for at Hoboken; and there is no evidence that it affected his conduct in any way. I think it is to be considered as part of an unfinished negotiation to renew the contract, and it certainly is not an unconditional refusal to perform it. We must remember, among the other facts, that it was not at this time apparent how advantageous the contract would be for the buyer.

I feel myself constrained, therefore, to decide against the assignees, for several reasons: 1. The sellers did not make an absolute and unequivocal renunciation of the contract. 2. The buyer did not accept or act upon the notice as being such a renunciation, or inform the sellers that he took it so. 3. It is not proved that the buyer was able and willing to perform his part of the contract. 4. He never notified such readiness. If the case turned merely on the consideration whether the one party or the other was bound to take the first step to reinstate the suspended contract, the judgment ought to be the same. The contract was suspended by the misfortune of Wheeler; and it was for him to give a clear and unequivocal notice of his intention to pay cash, before the sellers would be bound to manufacture the iron, or to send it to Hoboken. It cannot be that Carter & Co. must make an investment of $16,000 on the chance of an insolvent man becoming solvent, or being able to do by the aid of others what he confessedly could not perform himself. But this is only one of several reasons why the assignees must be held not to have been put by Wheeler, and not to have put themselves, in a position to claim damages on account of this contract.

If it were proved, or could be taken for granted, that the letter prevented Wheeler from attempting to pay for the first cargo or lot of iron, which is perhaps a question of some nicety, yet it surely ought not to affect his assignees. They could not have supposed that they were expected to pay the old debt as a condition precedent to receiving the iron, and they should have made an offer, and put the other party to his election to fulfil or reject. I cannot think, therefore, that in any event the damages could be assessed for the whole value of the contract. But, upon the evidence before me, I decide that there has been no breach at all. Debt admitted to proof in full.